16 - 5099-J6M

## AFFIDAVIT OF KEITH T. BROWN

I, Keith T. Brown, being duly sworn, hereby depose and state as follows:

### BACKGROUND

1.  I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since July 2014.   I am presently assigned to a Boston Division squad that investigates economic crimes, including wire fraud.

2.      I am aware that Title 18 of the United States Code, Section 1343, makes it a crime for anyone who has devised or intends to devise a scheme or artifice to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or caused to be transmitted by wire communication in interstate commerce, writings, signs, signals, pictures and sounds, for the purpose of executing or attempting to execute such scheme or artifice.

3.      My investigation has determined that NATHANIEL PONN ("PONN") has engaged in a scheme to defraud investment firms by opening hundreds of brokerage accounts and purchasing securities based on fraudulent bank account information, without putting any of his own funds at risk, and attempting to withdraw funds that were not in the accounts.

4.  I submit this Affidavit in support of a criminal complaint charging PONN with wire fraud in violation of 18 U.S.C. §1343.

5.      This Affidavit is based on statements made to me by witnesses and others assisting with the investigation, my review of business records and other documents, and information obtained from others, including the Securities and Exchange Commission ("SEC").   This Affidavit does not detail all of the facts known to me regarding this matter, but instead relates only

1

those facts that I believe are necessary to establish the requisite probable cause for issuance of the requested complaint and arrest warrant.

## The Scheme to Defraud

6.      Ponn is 27 years old and lives in Boston, Massachusetts.

7.      Beginning in at least 2012 and continuing until at least April 2015, PONN opened more than 400 brokerage accounts at nine investment firms located throughout the United States. To open many of the accounts, PONN provided false information, including names, social security numbers, assets and income.

8.      Each of the nine investment firms at which PONN opened brokerage accounts allows its customers to transfer funds from an account at another financial institution into the customer's brokerage account through an Automated Clearing House ("ACH") transfer.  A customer could do so by providing the account number and name of the financial institution where the account was held, and the amount to be transferred.  The investment firm would then begin the process of transferring the funds to the customer's brokerage account.

9.      Between February 2014 and April 2015, PONN provided ACH transfer information to brokerage firms for accounts he had opened on more than 350 occasions, with the amount of attempted transfers totaling more than $8.5 million.  In each instance, the bank account provided either did not have the amount of funds requested or did not even exist, and the ACH transfer was rejected.

10.     Some investment firms permit customers to purchase and sell securities during the period after they open an account and before the funds requested by ACH transfer are received. PONN took advantage of this practice by trading in securities during those periods without putting

his own money at risk, and knowing that the investment firms would never receive the funds. PONN purchased securities totaling more than $2.7 million in accounts at eight investment firms. Most of those transactions took place between February 2014 and April 2015, however PONN engaged in similar conduct on a smaller scale in 2007, and during the period from 2012 to 2014.

11.     When the investment firms discovered that the ACH transfers were rejected, they liquidated the securities in PONN's accounts, as allowed by the investment companies' agreements with its customers.   The net trading losses in all of PONN's accounts in which this occurred totaled about $26,000, with about $19,000 of those losses incurred within the past five years.

### Investment Firm A

12.     Between about January, 2014, and May, 2015, PONN opened approximately 280 brokerage accounts at Investment Firm A. He opened some of them using his own name, but opened many others using names of relatives and fictitious names.   Each time he did so, PONN used a computer in Massachusetts to access Investment Firm A's website and open an account. Investment Firm A's computer servers that handle account openings are located outside of Massachusetts.   Thus, each time PONN opened a new account at Investment Firm A, he caused an interstate wire to take place.   During that same time, PONN initiated more than 180 fraudulent ACH transfers in those accounts, knowing that the financial institutions either did not contain the funds requested or did not exist at all.   The total amount of those fraudulent ACH transfer requests was approximately $4 million.   Investment Firm A eventually suffered net trading losses of about $17,000 as a result of PONN's actions.

13.     PONN was also able to obtain a debit card from Investment Firm A and withdraw $300 from one of his accounts before Investment Firm A cancelled the card.

**Investment Firm B**

14.     On or about July 7, 2014, PONN used a computer in Massachusetts to open a brokerage account at Investment Firm B in his sister's name. As part of the account opening process, PONN caused a fraudulent ACH transfer request to be made in the amount of $100,000, knowing that the account at the designated financial institution did not contain such funds. Shortly after opening the account, PONN requested that Investment Firm B mail a check to him in the amount of $100,000. Investment Firm B was not deceived by PONN's scheme, and did not mail him the check.

15.     On or about July 9, 2014, PONN used a computer in Massachusetts to open a brokerage account at Investment Firm B in a fictitious name. As part of the account opening process, PONN caused a fraudulent ACH transfer request to be made in the amount of $150,000, knowing that the account at the designated financial institution did not contain such funds. Shortly after opening the account, PONN requested that Investment Firm B mail a check in the amount of $150,000. Investment Firm B was not deceived by PONN's scheme, and did not mail the check.

16.     Between about June 10, 2014 and July 10, 2014, PONN opened approximately 25 brokerage accounts at Investment Firm B. He opened some of them using his own name, but opened others using names of relatives and fictitious names. Each time he did so, PONN used a computer in Massachusetts to access Investment Firm B's website and open an account. Investment Firm B's computer servers that handle account openings are located outside of Massachusetts. Thus, each time PONN opened a new account at Investment Firm B, he caused an interstate wire to take place. During that same time, PONN initiated about 12 fraudulent ACH transfers in those accounts, knowing that the accounts at the financial institutions either did not

contain the funds requested or did not exist at all.  The total amount of those fraudulent ACH transfers was more than $900,000.

### Ponn's Statements

17.    On August 26, 2015, I, along with another FBI Special Agent, interviewed PONN at his home.  PONN provided the following information, among other things:  PONN opened dozens of brokerage accounts at investment firms to trade stocks.  PONN opened the accounts online or over the phone.  He used his own computer, as well as public computers at a library to create the accounts and access them after they were created.  PONN stated that he sometimes used family members' names or fictitious names to create the accounts.  PONN used his sister's name and social security number to open at least one account, and did so without her knowledge or permission.  He also used fictitious social security numbers when his own no longer worked to open accounts.  PONN stated that he sent checks to the investment firms or placed wire transfer requests, knowing that he did not have the funds in the bank to cover those checks or wire transfers.  He stated that he placed trades during the period when the investment firms were processing his checks or wire transfers.  He stated that he attempted to transfer any gains he had made trading out of the account before the investment company discovered that his funds would not clear, but was only successful on one occasion in the amount of $300.

## Conclusion

18.     Based on my knowledge, training and experience and the facts set forth in this
Affidavit, I have probable cause to believe and do believe that, between at least 2012 and April
2015, PONN committed wire fraud in violation of 18 U.S.C. §1343.



Sworn to under the pains and penalties of perjury.

Keith T. Brown, Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me March 30 , 2015


Robert B. Collings
United States Magistrate Judge